UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * | MDL 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates To: *All Cases in Pleading Bundle B3* | * | MAG. JUDGE SHUSHAN |

---

| | | |
|---|---|---|
| Anthony Kinh Tran d/b/a Johnny Tran LLC | * | CIVIL ACTION No. _____ |
| | * | SECTION J |
| PLAINTIFF | * | JUDGE BARBIER |
| vs. | | |
| | * | MAG. JUDGE WILKINSON |
| BP America Production Company; BP Exploration and Production, Inc.; BP, PLC.; BP Corporation North America, Inc.; BP Products North America, Inc.; Danos and Curole Marine Contractors, L.L.C.; DRC Emergency Services, L.L.C.; Halliburton Company; Transocean LTD; and Nalco Company | | |
| DEFENDANTS | | |

---

## COMPLAINT

COME NOW **ANTHONY KINH TRAN d/b/a JOHNNY TRAN LLC.,** (hereinafter referred to as Plaintiff) through undersigned counsel, file this Complaint against **BP America Production Company ("BP APC"), BP Exploration and Production, Inc. ("BP E&P"), BP, PLC, BP Corporation North America, Inc., BP Products North America, Inc., Danos and Curole Marine Contractors, L.L.C. d/b/a Danos and Curole ("D&C"), DRC Emergency Services, L.L.C. ("DRC"), Halliburton Company ("Halliburton"), Transocean LTD ("Transocean") and Nalco Company** (hereinafter sometimes referred to *in globo* as "Defendants"), alleging as follows:

Plaintiff is a resident of Orleans Parish in the state of Louisiana. Plaintiff timely opted-out of the Economic and Property Damages in connection with the Defendants' Mutli-District Litigation. Plaintiff entered into a contract under the Master Vessel Charter Agreement with BP APC.

<u>**DEFENDANTS**</u>

I.

Made defendant herein is **BP America Production Company ("BP APC"),** a Delaware corporation, with its principal place of business in Houston, Texas, authorized to do, and doing, business in the State of Louisiana.

II.

Also made Defendant herein is **BP Exploration & Production, Inc. ("BP E&P"),** a Delaware corporation, with its principal place of business in Warrenfield, Illinois, authorized to do, and doing, business in the State of Louisiana.

III.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates To: *All Cases in Pleading Bundle B3* | * | MAG. JUDGE SHUSHAN |

---

| | | |
|---|---|---|
| Anthony Kinh Tran d/b/a Johnny Tran LLC | * | CIVIL ACTION No. _____ |
| | * | SECTION J |
| **PLAINTIFF** | * | JUDGE BARBIER |
| vs. | | |
| | * | MAG. JUDGE WILKINSON |
| BP America Production Company; BP Exploration and Production, Inc.; BP, PLC.; BP Corporation North America, Inc.; BP Products North America, Inc.; Danos and Curole Marine Contractors, L.L.C.; DRC Emergency Services, L.L.C.; Halliburton Company; Transocean LTD; and Nalco Company | | |
| **DEFENDANTS** | | |

---

## COMPLAINT

COME NOW **ANTHONY KINH TRAN d/b/a JOHNNY TRAN LLC.,** (hereinafter referred to as Plaintiff) through undersigned counsel, file this Complaint against **BP America Production Company ("BP APC"), BP Exploration and Production, Inc. ("BP E&P"), BP, PLC, BP Corporation North America, Inc., BP Products North America, Inc., Danos and Curole Marine Contractors, L.L.C. d/b/a Danos and Curole ("D&C"), DRC Emergency Services, L.L.C. ("DRC"), Halliburton Company ("Halliburton"), Transocean LTD ("Transocean") and Nalco Company** (hereinafter sometimes referred to *in globo* as "Defendants"), alleging as follows:

Plaintiff is a resident of Orleans Parish in the state of Louisiana. Plaintiff timely opted-out of the Economic and Property Damages in connection with the Defendants' Mutli-District Litigation. Plaintiff entered into a contract under the Master Vessel Charter Agreement with BP APC.

## DEFENDANTS

### I.

Made defendant herein is **BP America Production Company ("BP APC"),** a Delaware corporation, with its principal place of business in Houston, Texas, authorized to do, and doing, business in the State of Louisiana.

### II.

Also made Defendant herein is **BP Exploration & Production, Inc. ("BP E&P"),** a Delaware corporation, with its principal place of business in Warrenfield, Illinois, authorized to do, and doing, business in the State of Louisiana.

### III.

Also made Defendant herein is **BP, PLC**, headquartered in London, England, authorized to do, and doing, business in the State of Louisiana.

IV.

Also made Defendant herein is **BP Corporation North America, Inc.,** with its principal place of business in Long Beach, CA, authorized to do, and doing, business in the State of Louisiana.

V.

Also made Defendant herein is **BP Products North America, Inc.,** with its principal place of business in Naperville, IL, authorized to do, and doing, business in the State of Louisiana.

VI.

Also made Defendant herein is **Danos and Curole Marine Contractors, L.L.C., d/b/a Danos and Curole ("D&C"),** a Louisiana corporation, with its principal place of business in Larose, LA, authorized to do, and doing, business in the State of Louisiana.

VII.

Also made Defendant herein is **DRC Emergency Services, LLC, ("DRC"),** an Alabama limited liability company, with its principal place of business in Mobile, Alabama, authorized to do, and doing, business in the State of Louisiana.

VII.

Also made Defendant herein is **Haliburton Company ("Halliburton"),** a Delaware corporation, with its principal place of business in Houston, Texas and at all times pertinent hereto, was authorized to do, and doing business in the State o Louisiana.

VIII.

Also made Defendant herein is **Transocean Ltd ("Transocean"),** a Swiss corporation that maintains U.S. offices in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

IX.

Also made Defendant herein is **Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC, and Nalco Holding Company (collectively referred to as "Nalco Company"),** a Delaware corporation, with its principal place of business in Naperville, Illinois, authorized to do, and doing, business in the State of Louisiana.

### JURISDICTION AND VENUE

I.

Jurisdiction is proper pursuant to 43 U.S.C. § 1349(b)(1)(a), the district courts of the under United States have jurisdiction to hear cases "arising out of, or in connection with any operation conducted on the outer Continental Shelf…" In addition, this court has original subject matter jurisdiction under 28 U.S.C. § 1331, for all civil actions which arise from federal law and Article III of the Constitution of the United States and 28 U.S.C. §1333, under the Court's Admiralty and Maritime Jurisdiction. Jurisdiction is also proper pursuant to Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA) and other federal relevant statutes.

II.

Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order. Venue is also appropriate in this District pursuant to the OPA, 33 U.S.C. § 2717 (b), because the discharge, injuries and damages occurred in this District.

## SUMMARY OF FACTS

Prior to the Oil Spill, the Gulf Coast seafood industry was a vibrant and lucrative business employing more than 213,000 people and producing more than $10.5 billion to the local economy. The force behind such success was the more than 13,000 commercial fishing vessels in the Gulf, over one-half of which were owned and operated by Vietnamese and Cambodian Americans. On April 20, 2010 an explosion and fire occurred on the BP, Inc.-licensed Transocean drilling rig, Deepwater Horizon, in the Gulf of Mexico. This explosion killed 11 people and spilled approximately 4.9 million barrels of crude oil into the Gulf creating the worst oil spill disaster in the history of the United States. As a result, approximately one-third of the United States territory in the Gulf was closed to commercial fishing, leaving many fishermen without gainful employment. BP responded to the disaster by implementing the Vessel of Opportunity (VoO) program, which employed thousands of chartered fishing vessels to contain and burn surface oil. Even though over half of all active commercial fishermen were Vietnamese and Cambodian Americans, less than 10% of all the vessels hired for the VoO program were those of Vietnamese and Cambodian Americans. It is estimated that of the 5,000 VoO vessels hired, only around 350 vessels belong to Vietnamese and Cambodian Americans. To worsen the situation, for some of VoO contractors actually hired, BP APC, D&C

and/or BP E&P, breached their contractual obligations to pay these individuals their respective daily fixed rate for charter hire and crew services during the entire charter term.

In addition, BP sprayed more than 1.8 million gallons of hazardous chemical dispersants onto the ocean surface and also injected these same chemicals below the surface of the water. Many vessel operators and crewmen were directly within the spray zone of the chemical dispersants without prior warning. Although the leaking well is now capped, the disastrous effects of the spill and its post-spill cleanup on the public health, the environment and the loss of income, businesses and property of the Gulf Coast residents are widespread and will likely remain so for decades. Commercial fishermen and nearby businesses whose livelihoods and very existence depend on the Gulf will incur the most damage due this man-made, but preventable catastrophe.

### FIRST CLAIM FOR RELIEF:

### BP'S BREACH OF MASTER VESSEL CHARTER AGREEMENTS

#### I.

The April 20, 2010 disaster triggered certain obligations for BP, Inc. under the Oil Pollution Act 1990, ("OPA"), which includes imposing liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damage that result from such incident as well as removal costs. 33 U.S.C. § 2702.

#### II.

The U.S. Coast has formally and/or informally designated Defendants as "responsible parties" under the OPA. Therefore, Defendants are liable pursuant to Section 2702 for all the damages that result from the Oil Spill.

III.

To comply with its obligations under the OPA, BP, Inc. and its subsidiaries, including Defendants BP APC and BP E&P, created the Vessels of Opportunity Program ("VoO"). Because of the sheer size of the April 20, 2010 disaster and resulting spill, BP, Inc. used the VoO as its primary "way to attack the oil offshore" as required by U.S. Federal law.

IV.

BP APC and/or D&C contracted with over 5,000 commercial, recreational, and charter fishing vessels to assist in oil spill cleanup activities as required by OPA including but not limited to: supporting skimming, tending and maintaining boom, collecting sheen and light oil in shallower waters, finding and removing tar balls from the water, and transportation of supplies, personnel and wildlife.

V.

It was the intention of BP APC and/or D&C to contract with vessels using a document entitled MASTER VESSEL CHARTER AGREEMENT (hereafter MVCA). The MVCA was drafted by BP APC, D&C and/or BP E&P. Slightly altered versions of the MVCA were issued during the course of BP APC, D&C and/or BP E&P's implementation of the VoO. However these changes do not affect the substance of Plaintiff's claims.

VI.

Article 2 of the MVCA demands that each vessel be employed exclusively for BP APC's use, and that the entire reach of the vessel's deck and accommodation spaces be at BP APC's disposal during the charter term.

### VII.

Article 2 of the MVCA makes clear that each vessel must be available and at BP APC's disposal for operation twenty-four hours per day during the charter term.

### VIII.

Article 2 of the MVCA further provides that each vessel shall not be used for any purpose other than performance of services during the charter term.

### IX.

Article 1 of the MVCA states that the term of the charter "shall commence on the date of the departure of the Vessel from the mutually agreed location of delivery into the service of the Charterer, and shall be referred to as the "CHARTER TERM."

### X.

Article 1 of the MVCA states that BP APC may terminate the MVCA at any time and provides two conditions necessary for the termination of the charter term.

### XI.

The first condition is set forth in Article 1. B., which provides that the charter term terminates pursuant to the "off-hire dispatch notification."

### XII.

The second condition necessary to terminate the charter term is found in Article 10. E., which provides that the termination of the charter term (or termination of dispatch) occurs at the time the vessel is secure in its moorings at the original point of

delivery, and secure at its mooring after final decontamination. Alternate versions of the MVCA provide the same language at Article 10. D.

## XIII.

Article 10. B, *et seq*. provides that BP APC will pay for each 24 hour period of the charter term the rate set forth in Exhibit "A" of the MVCA.

## XIV.

During the charter term, BP APC, D&C and/or BP E&P, agreed to pay fixed rates based primarily on the length of the vessel. The fixed rates were: vessels greater than 65', $3,000 per day; vessels greater than 45' and up to and including 65', $2,000 per day; *vessels greater than 30' and up to and including 45', $1,500 per day* (applicable category); and vessels less than 30', $1,200.00 per day. Crew services, including spill response, classroom training, etc., were paid at $200.00 per day for every eight-hour shift, and $300.00 per day for every 12-hour shift.

## XV.

BP APC, D&C and/or BP E&P also agreed to reimburse certain costs including fuel, hydraulic oil and lube oil during the charter term.

## XVI.

Plaintiff had one 35' vessel, LA 0001 AA, contracted under the VoO program under the MVCA.

## XVII.

BP APC, D&C and/or BP E&P, breached the contractual obligation to pay the respective daily fixed rate for charter hire and crew services during the entire charter term pursuant to the MVCA to Plaintiff.

XVIII.

BP APC, D&C and/or BP E&P owes and has failed to pay Plaintiff daily fixed rate charter hire and fixed rate crew services pay for each day of the charter term until both: 1) the date that the vessel was finally decontaminated and 2) the plaintiff received the "Off Hire Dispatch Notification."

XIX.

Furthermore, Plaintiff incurred costly damage to and/or modifications of their respective vessels in order to participate in the VoO program and BP APC and/or BP E&P has failed to repair the respective vessels and/or failed to pay for said repairs.

## SECOND CLAIM FOR RELIEF:

## BUSINESS ECONOMIC LOSS UNDER THE OIL POLLUTION ACT

I.

Under OPA Section 2702(b)(2)(C) a person who uses natural resources for subsistence may recover for damage to, or loss or destruction of, those natural resources.

II.

Furthermore, under OPA Section 2702(b)(2)(E) damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real, property, personal property, or natural resources are recoverable by *any* claimant. Members on Congress on several occasions specifically identified commercial fishermen as primary beneficiaries of this section.[1]

---

[1] House Conference Report states: "Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity resulting from injury to property or natural resources. The claimant need not be the owner of the damaged property or resources to recover for lost profits or income. For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fishermen do

III.

Plaintiff is a licensed, commercial fishermen who relies for their businesses on fisheries/seafood in the Gulf of Mexico. The oil spill has polluted the waters in which they fish/shrimp, and they have been and will be unable to fish/shrimp for an extended period of time, resulting in deprivation of access to fisheries/seafood and lost profits.

IV.

Plaintiff is a commercial fishermen located in the immediate vicinity of the spill in Coastal Louisiana and Mississippi. Furthermore, all of the seafood sold/served come from the Gulf of Mexico. Because of the oil spill, their regular customers—dockworkers, fishermen, and other jobs connected with maritime commerce—are not buying/visiting their seafood businesses thereby resulting in lost profits.

V.

Furthermore, upon information and belief, Plaintiff lost profits and revenues because of general consumer fears about contaminated seafood caused after the spill.

VI.

As a direct and proximate cause of the Oil Spill, Plaintiff has sustained economic loss due to contamination of natural fisheries/shrimps and lost business profits from their real and/or personal property as a result and therefore entitled to such damages in amounts to be determined by the trier of fact.

---

not own those resources." *H.R. Conf. Rep.* No. 101-653, at 104 (1990); Senate Report explicitly refer to economic damages as including "both loss of use and loss of subsistence use of natural resources . . . Under this provision, fishermen, for example would not only receive the equivalent of unemployment compensation, but would also receive compensation to prevent loss of a boat. Lost wages are of limited value if the means of earning wages, such as a boat, go uncompensated." *S. Rep.* No. 101-94, at 12 (1990).

**THIRD CLAIM FOR RELIEF:**

**BUSINESS ECONOMICS LOSS UNDER GENERAL MARITIME LAW**

I.

Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

II.

Admiralty law applies to accidents that occur on navigable waters and involve traditional maritime activities, even when those sorts of activities cause injuries on land.

III.

Admiralty law permits the allowance of claims by commercial fishermen alleging lost profits resulting from negligence causing harm to fishing.[2]

IV.

Furthermore, Admiralty law allows for commercial fishermen to recover economic damages absent direct injury to person or property. Similarly, courts have held that the polluter owes a duty of care to those who fell within the "zone of risk."[3] This causation is presumed for all businesses in the immediate vicinity of the oil spill in Zone A, which is laid out in this Court's Settlement Order. These businesses need only establish two things to recover for business economic losses: 1) there is reduction in variable profit between the Compensation Period (three or more consecutive months from

---

[2] *Union Oil Co. v. Oppen*, 501 F.2d 558, 570 (9th Cir. 1974); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1021 (5th Cir. 1985); Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 12-7, at 795 (4th ed. 2004) ("A long standing line of cases grants recovery for lost profits to commercial fishermen whose activities are disrupted as a result of pollution or other casualty.").

[3] *Curd v. Mosaic Fertilizer, LLC.*, 39 So. 3d 1216 (Fla. 2010): Judge Polston, in a concurring opinion, states claimants include "all fishermen and those persons engaged in the *commercial catch and sale* of fish." (Emphasis added).

May through December 2010) and the Benchmark Period (same months as Compensation Period from either 2009, average of 2008-2009, or average of 2007-2009), and 2) provide compensation for increased profits that reasonable could have been expected to be generated in 2010 but for the oil spill.

V.

Plaintiff reasserts he is a licensed, commercial fishermen who relies for their businesses on fisheries/seafood in the Gulf of Mexico. The oil spill has polluted the waters in which they fish/shrimp, and they have been and will be unable to fish/shrimp for an extended period of time, resulting in deprivation of access to fisheries/seafood and lost profits.

VI.

Plaintiff reasserts that he is a commercial fishermen located in the immediate vicinity or "zone of risk" of the spill in Coastal Louisiana. Furthermore, all of the seafood sold/served come from the Gulf of Mexico. Because of the oil spill, their regular customers—dockworkers, fishermen, and other jobs connected with maritime commerce—are not buying/visiting their seafood businesses thereby resulting in lost profits.

VII.

As a direct and proximate cause of the Oil Spill, Plaintiff has sustained economic loss due to contamination of natural fisheries/shrimps and lost business profits from their real and/or personal property as a result and therefore entitled to such damages in amounts to be determined by the trier of fact.

**FOURTH CLAIM FOR RELIEF:**

## DISCRIMINATION UNDER §1981 OF THE CIVIL RIGHTS ACT OF 1866

I.

Plaintiff alleges **BP APC, BP E&P, DRC, and D&C** engaged in intentional

discrimination in violation of Section 1981 of the Civil Rights Act of 1866 which states:

"All persons within the jurisdiction of the United States have the same right in every

State and Territory to make and enforce contracts, to sue, be parties, give evidence, and

to the full and equal benefits of all laws and proceedings for the security of persons and

property as is enjoyed by white citizens, and shall be subject to like punishment, pains,

penalties, taxes, licenses, and exactions of every kind, and to no other."

II.

In 1991, Congress amended by adding a subsection (b), which made clear Section

1981 prohibits not only discrimination in the formation of contracts but also in all aspects

of the contractual relationship between the parties: "For purposes of this section, the term

"make and enforce contracts" includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship."

III.

To clean the crude oil from the Gulf, BP established the VoO Program through

which they intended to employ the affected fishermen to assist in the clean-up.  BP hired

DRC Emergency Services (DRC), and Danos and Curole Marine Contractors (D&C) to

manage the VoO Program.

IV.

According to a study performed by Dr. David D. Burrage, Extension Professor of Marine Resources at Mississippi State University, one-third of the boats with Gulf of Mexico federal shrimp permits, and over one-half of the boats actually fishing, belonged to Vietnamese-Americans. Vietnamese-Americans operated 62% of all Mississippi licenses for vessels over 45 feet, 75% of all Louisiana licenses for vessels over 50 feet, and 65% of Alabama licenses for vessels over 45 feet. This number does not include a smaller, but significant percentage belonging to Cambodian-Americans.

V.

Despite over half of all active commercial fishermen affected by the Oil Spill were Vietnamese and Cambodian Americans, less than 10% of all the vessels hired for the VoO Program were owned by Vietnamese and Cambodian-Americans. It is estimated that of the 5,000 marine vessels hired, only around 350 vessels belonged to Vietnamese and Cambodian-Americans.

VI.

The reason for this discrepancy was the discriminatory acts of BP. Based on information and belief, during the implementation of the VoO Program, BP sent out email messages to DRC and D&C, specifically demanding that they not hire vessels owned by Vietnamese and Cambodian Americans.

VII.

Based on information and belief, DRC and D&C colluded in this despicable ploy by limiting the number of Vietnamese and Cambodian-Americans that they hired.

VIII.

Plaintiff alleges **BP APC, BP E&P, DRC, and D&C** engaged in intentional discrimination and have done so with malice or reckless indifference to Vietnamese and Cambodian-American fishermen who were most affected by the BP Oil Spill.

## FIFTH CLAIM FOR RELIEF:

## LOSS OF SUBSISTENCE

### I.

Plaintiff alleges **BP APC, BP E&P, DRC, and D&C's** actions caused a loss of subsistence to the Plaintiff and his family.

Plaintiff qualifies as a Subsistence Claimant because Plaintiff is a Natural Person who fishes or hunts to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including seafood, in a traditional or customary manner, to sustain his or her basic personal or family dietary, economic security, shelter tool, or clothing needs, and who relied upon subsistence resources that were diminished or restricted in the geographic region used by the Plaintiff due to or resulting from the DWH spill and the impairment and/or closures of the natural body of water where the Plaintiff fished or harvested their subsistence by commercial fishing methods and/or by recreational rod and reel.

### II.

As a direct and proximate cause of the Oil Spill, Plaintiff has sustained a loss of subsistence. Furthermore, the loss of subsistence directly caused the expenditure of personal funds for the replacement of loss subsistence; therefore Plaintiff is entitled to such damages in amounts to be determined by the trier of fact.

## DAMAGES

I.

The sole and proximate cause of the injuries and damages sustained by Plaintiff was attributable to the individual, joint, solidary, concurrent and/or successive negligence and/or discrimination acts of the Defendants.

II.

Plaintiff itemizes the damages to which they are entitled as a result of the oil spill and injury proximately caused by the negligence and/or discriminatory acts of the Defendants as follows, to-wit:

a)   Past physical pain, suffering and discomfort;

b)   Past mental anguish, aggravation, and annoyance;

c)   Disability;

d)   Future physical pain, suffering and discomfort;

e)   Future mental anguish, aggravation and annoyance;

f)   Past medical expenses;

g)   Past lost wages;

h)   Future lost wages;

i)   Property damage;

j)   Loss of use of vessels;

k)   Loss of enjoyment of life;

l)   Loss of use/function of parts of body;

m)   Impairment of psychological functioning;

n)   Disability from engaging in recreation;

o)   Destruction of earning capacity.

p)   Loss of past business profits.

q)   Loss of future business profits.

### RESERVATION OF RIGHTS TO AMEND

Plaintiff reserves the right to amend and supplement this petition as necessary.

### PRAYER FOR RELIEF

Plaintiff prays for trial by jury.

WHEREFORE, Plaintiff prays this Honorable Court to issue process, that due proceedings be had, and that this Honorable Court render judgment against Defendants, **BP America Production Company ("BP APC"), BP Exploration and Production, Inc. ("BP E&P"), BP, PLC, BP Corporation North America, Inc., BP Products North America, Inc., Danos and Curole Marine Contractors, L.L.C. d/b/a Danos and Curole ("D&C"), DRC Emergency Services, L.L.C. ("DRC"), Halliburton Company ("Halliburton"), Transocean LTD ("Transocean") and Nalco Company** for all actual, compensatory, and punitive damages, plus interest, attorneys' fees, and such other and further relief as Plaintiff may show he is justly entitled to receive.

Respectfully Submitted:

Tu Thomas Hoang. (La. Bar No. 35494)
Anh "Joseph" Cao (La. Bar No. 26836)
Cao Law Firm
2439 Manhattan Blvd. Suite 302
Harvey, LA 70058
504-367-5001 (phone)
504-684-1231 (facsimile)

thoang@caolawfirm.com
acao@loyno.edu
tonytran@caolawfirm.com